1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   MAIDEL AROSTEGUI CASTELLON,              Case No. 1:25-cv-00968 JLT EPG

12                    Petitioner,             ORDER GRANTING PRELIMINARY
                                              INJUNCTION[1]
13   v.
                                              (Doc. 2)
14
     POLLY KAISER, Acting Field Office
15   Director of the San Francisco Immigration
     and Customs Enforcement Office; TODD
16   LYONS, Acting Director of United States
     Immigration and Customs Enforcement;
17   KRISTI NOEM, Secretary of the United
     States Department of Homeland Security;
18   PAMELA BONDI, Attorney General of the
     United States, acting in their official
19   capacities; MINGA WOFFORD, Mesa
     Verde ICE Processing Center Facility
20   Administrator,

21                    Respondents.

22

23

24        Maidel Arostegui Castellon, a Nicaraguan national, claims to have fled her home country

25   after facing violent political persecution. (Doc. 1, ¶ 54.) She crossed the U.S.-Mexico border in

26   _____

27   [1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for
     preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not
     required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief
28   granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for
     Preliminary Injunction.

1    January 2022 and turned herself in to immigration officials near Eagle Pass, Texas. (*Id.*; Doc. 9-

2    1 at 6.) At that time, she expressed a fear of return to her home country. (Doc. 9-1 at 7, 14) She

3    has been in immigration removal proceedings since that time.

4           After a brief detention in January 2022 following her entry into the United States,

5    immigration officials placed Ms. Arostegui Castellon's case in routine processing and released

6    her on her own recognizance with a notice to appear in immigration court. (Doc. 1 at ¶ 55; Doc.

7    9-1 at 9.) In doing so, immigration officials necessarily determined that Petitioner did not present

8    a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer authorized

9    to issue a warrant of arrest may, in the officer's discretion, release an alien not described in

10    section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the Act;

11    provided that the alien must demonstrate to the satisfaction of the officer that such release would

12    not pose a danger to property or persons, and that the alien is likely to appear for any future

13    proceeding.").

14           Ms. Arostegui Castellon attended her first immigration hearing in San Francisco

15    Immigration Court in March 2022. (*Id.*, ¶ 57.) In January 2023, she submitted timely

16    applications for asylum and protection from removal under the Convention Against Torture. (*Id.*)

17    During the more than three years she remained out of custody since her initial release, Ms.

18    Arostegui Castellon lived with family in San Francisco, maintained gainful employment, kept a

19    clean criminal record, attended classes at a community college, participated in her church

20    community, and complied with all requirements to appear in immigration court and check ins

21    with immigration officials. (*See* Doc. 1, ¶¶ 1, 57, 65.) The government does not refute this

22    evidence and agrees she has no criminal history. (Doc. 9-1 at 6, 14)

23           On July 30, 2025, Petitioner appeared at the San Francisco Immigration Court for a

24    "master calendar" hearing. (*Id.*, ¶ 58.) During the hearing, at which Petitioner was not represented

25    by counsel because she could not afford to retain a lawyer, Department of Homeland Security

26    (DHS) presented a motion to dismiss Petitioner's immigration court proceedings so that DHS

27    could designate her for "expedited removal" proceedings. (*Id.*; Doc. 9-1 at 27–31.)[2] The

28

---

[2] Specifically, DHS moved to dismiss the Section 240 proceedings because the "[c]ircumstances of the [respondent's]

1    immigration judge explained the motion to Petitioner and whether she agreed to the motion. (Doc.

2    1, ¶ 58.) Petitioner did not. (*Id.*) The immigration judge then adjourned the hearing and set the

3    case for another "master calendar" hearing to occur on October 1, 2025, in part to give Petitioner

4    additional time to find a lawyer. (*Id.*) The government concedes that the October 1 hearing "is

5    related to her pending asylum/withholding application." (Doc. 9 at 2.) Her immigration

6    proceedings remain pending before the San Francisco Immigration Court. (*See* Doc. 1, ¶ 88.)

7         Upon exiting the courtroom after the July 30, 2025 hearing, Petitioner was arrested by

8    ICE agents. (Doc. 1, ¶ 59; Doc. 9-1 at 16.) Once again, at that time, she expressed a fear of

9    returning to her home country. (Doc. 9-1 at 14) At some point that same day, she was served with

10   a Warrant for Arrest of Alien (Form I-200) and an informational handout (M-444, in Spanish)

11   about the credible fear interview process[3]. (Doc. 9 at 2; see also Doc. 9-1 at 17–24.) The I-200

12   justified her detention by checking the boxes associated with: (1) the pendency of ongoing

13   removal proceedings against Ms. Arostegui Castellon; and (2) "statements made voluntarily by

14   the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the

15   subject either lacks immigration status or notwithstanding such status is removable under U.S.

16   immigration law," which presumably is a reference to the admissions she made in January 2022

17   that she entered the United States without being lawfully admitted at a Port of Entry and that she

18   was a citizen of Nicaragua with no right to lawful presence in the United States. (*See* Doc 9-1 at

19   6, 18.) The government exhibits indicate that she was re-detained based upon § 212(a)(6)(A)(i),

20   which reads, "An alien present in the United States without being admitted or paroled, or who

21   arrives in the United States at any time or place other than as designated by the Attorney General,

22   is inadmissible." (Doc. 9-1 at 13)

23

---

24   case have changed after the notice to appear was issued to such an extent that continuation is no longer in the best
     interest of [DHS]." 8 C.F.R. § 239.2(a)(7); *see* 8 C.F.R. §§ 1239.2(c) (providing that after the commencement of
25   removal proceedings, DHS may move for dismissal of the case on the grounds set out under 8 C.F.R. § 239.2(a)),
     1239.2(b)." (Doc. 9-1 at 28–29.) The government did not explain then or now exactly what these changes in
26   circumstances were. Seemingly, it could not have been the dismissal of the § 240 proceedings since the § 240
     proceeding has not been dismissed. Notably, despite intending to be a brief on the merits, the government does not
27   challenge the allegation that the detention was ordered to satisfy "a new daily quota of 3,000 ICE arrests." (Doc. 1 at
     12)
28   [3] The government does not contend that during her more than 3-year parole period that it provided her with a credible
     fear interview.

1          Petitioner suffers from hypertension, early-stage diabetes, and anxiety. (Doc. 1, ¶¶ 60–61.)

2    She takes at least six prescription medications twice daily to manage her conditions. (*Id.*, ¶ 60.)

3    When Petitioner arrived at her hearing on July 30, 2025, she only had two of the six medications

4    with her. (*Id.*)

5          After her arrest, ICE agents transported Petitioner to a short-term holding area inside the

6    ICE San Francisco Field Office. (Doc. 1, ¶ 62.) Once there, Petitioner started to feel ill. (*Id.*)

7    Volunteers present at the Field Office alerted ICE agents that Petitioner's blood pressure was

8    increasing to dangerous levels and that she required immediate medical attention. (*Id.*) An ICE

9    agent took her blood pressure reading on at least two occasions after the volunteers asked him to

10    do so, and both readings indicated that Petitioner's blood pressure was high and rising. (*Id.*)  ICE

11    subsequently transferred Petitioner to Mesa Verde, where she is currently detained. (*Id.*) Ms.

12    Arostegui Castellon reports that she is now being provided five of her six needed medications, but

13    she has not been provided her sixth medication, which she is required to take twice per day. (Doc.

14    1, ¶ 68.) Ms. Arostegui Castellon alleges that "the California Department of Justice ("Cal DOJ")

15    recently found that at Mesa Verde, 'does not acquire and review offsite care and medical records

16    in a timely manner to ensure adequate treatment.' Cal. Dept. of Justice, Office of the Attorney

17    General, Immigration Detention in California (Apr. 2025), at pp. 80,

18    https://oag.ca.gov/system/files/media/immigration-detention-2025.pdf. Cal DOJ also found that

19    '[d]etainees experience prolonged wait times for some out-of-facility care for health care issues.'

20    *Id.*" (Doc. 1, ¶ 68)

21          On August 5, 2025, Ms. Arostegui Castellon filed a petition for writ of habeas corpus

22    alleging that her detention constitutes a violation of the Fifth Amendment's right to substantive

23    and procedural due process, her Fourth Amendment right prohibiting her unlawful seizure and her

24    First, and the Administrative Procedure Act. (Doc. 1 at 17–20.) She seeks immediate release from

25    custody, a declaration of the violation of her rights under the Fourth and Fifth Amendments as

26    well as the Administrative Procedure Act, an injunction prohibiting her transfer away from this

27    District and from her further unlawful detention, and for costs and her attorney's fees. (*Id.* at 20–

28    21.)

1    On the same day, she also filed an ex parte motion for a temporary restraining order. (Doc

2    2.) In this motion, she seeks her immediate release "without any intrusive electronic monitoring"

3    and an injunction against her further re-detention "absent further order of this Court" or unless

4    Respondents "demonstrate at a pre-deprivation bond hearing, by clear and convincing evidence,

5    that Petitioner is a flight risk or danger to the community such that her physical custody is

6    required;" and an order prohibiting her transfer out of this District and/or removal from the

7    country until these habeas proceedings are concluded. (*Id*. at 12–13.)

8    The government opposes the issuance of preliminary injunctive relief and maintains that

9    Petitioner's detention is "mandatory" under expedited removal procedures set forth at 8 U.S.C.

10   § 1225(b)(1), (*see generally* Doc. 9), notwithstanding the fact that Petitioner's removal

11   proceedings pursuant to 8 U.S.C. § 1229a remain pending and she has not been placed in

12   expedited removal.

13   For the reasons set forth below, the Court converts the request for a temporary restraining

14   order into a request for a preliminary injunction and **GRANTS** the motion.

15   **II.    LEGAL BACKGROUND**

16   **A.    Section 240 v. Expedited Removal Proceedings**

17   Immigration law provides two main processes for removing noncitizens deemed ineligible

18   to enter or remain in the United States. The first, commonly referred to as "Section 240" or

19   "Section 1229a" proceedings, is the standard mechanism for removing inadmissible noncitizens.

20   *See generally* 8 U.S.C. § 1299a. "Section 240 removal proceedings take place before an

21   [Immigration Judge (IJ)], an employee of the Department of Justice (DOJ) who must be a

22   licensed attorney and has a duty to develop the record in cases before them." *Coalition For*

23   *Humane Immigrant Rights, v. Noem*, No. 25-CV-872 (JMC), 2025 WL 2192986, at *3 (D.D.C.

24   Aug. 1, 2025)[4] (citing 8 U.S.C. § 1229a(a)(1), (b)(1) ("The immigration judge shall administer

25   oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any

26   witnesses.").)

27

28   [4] This ruling has been appealed to the D.C. Circuit, *Coalition for Humane Immigrant Rights, et al v. Kristi Noem*, et al, 25-5289 (D.C. Cir.).

1

2    [Section 240 proceedings] are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The hearings are recorded, and a transcript is made available if a party appeals the decision. *Id*. § 1229a(b)(4)(C). A section 240 proceeding typically takes place over the course of multiple hearings due to the built-in procedures. This allows time for noncitizens to both gather evidence in support of petitions for relief available in immigration court (like asylum and certain adjustments of status) and seek collateral relief from other components of DHS (like adjustment of status on the basis of marriage or family). Upon a decision by the IJ, either party may appeal to the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the noncitizen may then appeal that decision to a U.S. court of appeals. 8 U.S.C. § 1252.

3

4

5

6

7

8

9    *Coalition*, 2025 WL 2192986, at *3 (internal record citations omitted).

10   Alternatively, an immigrant may be placed in "expedited removal" status for reasons,

11   including that the person entered the United States without a valid visa or other valid entry

12   documents. *See generally* 8 U.S.C. § 1225. In expedited removal, the process is overseen by an

13   immigration officer, rather than an IJ. 8 C.F.R. § 235.3(b)(2)(i). The officer asks the immigrant

14   questions about their "identity, alienage, and inadmissibility," and whether they intend to apply

15   for asylum, fear persecution or torture, or fear returning to their country of origin.

16   § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no

17   recording or transcript is made. 8 C.F.R. § 235.3(b)(2)(i).

18   Under the expedited removal process, if the immigrant claims asylum of fear of

19   persecution or torture, or a fear of returning to his or her country, "the inspecting officer shall not

20   proceed further with removal of the alien until the alien has been referred for an interview by an

21   asylum officer in accordance with 8 CFR 208.30." § 253(b)(4). Once the referral happens, the

22   referring officer must provide the immigrant with a written disclosure (Form M-444), which

23   describes the credible fear interview, including,

24   (A) The purpose of the referral and description of the credible fear interview process;

25   (B) The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;

26   (C) The right to request a review by an immigration judge of the asylum officer'' credible fear determination; and

27   (D) The consequences of failure to establish a credible fear of persecution or torture.

28

6

§ 253(b)(4)(i). The asylum officer then must interview the immigrant and determine if the immigrant expressed a credible fear of persecution or torture. Whatever the officer's determination, it must be reviewed by the supervisory asylum officer before it becomes effective. § 208.30(3)(8). If there is a finding of credible fear, the case is converted to a § 240 proceeding[5] and set before an IJ. If the asylum officer and the supervisor determine that the immigrant has not demonstrated a credible fear of persecution or torture, the immigrant may request review by an IJ. § 208.30(g). For all intents and purposes, the IJ's determination is final without further review. *Id*. Indeed, habeas corpus review of the determinations made related to the expedited removal is limited. 8 U.S.C. § 1252(e)(2).

In *Coalition*, the District of Columbia District Court determined that under 8 U.S.C. § 1225(b)(1)(A)(iii)(II), a person who has been paroled without first having been placed in expedited removal <u>cannot be designated for expedited removal</u>. As *Coalition* explained:

> Noncitizens may be eligible for expedited, rather than section 240, removal only if they are inadmissible on the basis that they either lack proper entry documents or falsified or misrepresented their application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); see id. § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility). Among that set, only two categories of noncitizens are eligible for expedited removal: (1) noncitizens "arriving in the United States," and (2) noncitizens who "ha[ve] not been admitted or paroled into the United States" and cannot affirmatively show that they have been "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." 8 U.S.C. § 1225(b)(1)(A)(i)–(iii).6 The statute permits the Attorney General (who has since delegated this authority to the DHS Secretary) to designate the population of noncitizens within that second category who will be subject to expedited removal. And that designation lies within the Secretary's "sole and unreviewable discretion." *Id*. § 1225(b)(1)(A)(iii); see 8 C.F.R. § 235.3(b)(ii) . . .

*Coalition* concluded that the statute "forbids the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22.

**B.    Parole**

ICE may choose to release a person on parole. The decision is discretionary and is made on a case-by-case basis. An immigrant who has been detained at the border, may be paroled for

---

[5] Alternatively, the case may be moved into administrative asylum proceedings under § 208.30(f).

1   humanitarian reasons or due to it providing a significant public benefit (8 U.S.C. § 1182(d)(5)(A))

2   or conditionally paroled (8 U.S.C. § 1226(a)). These are distinct procedures. A person released on

3   conditional parole is usually released on their own recognizance subject to certain conditions such

4   as reporting requirements. cannot be released on condition parole if the immigrant was subject to

5   mandatory detention under § 1226(c). To be released on conditional parole/on the person's own

6   recognizance, there must be a finding that the immigrant does not pose a risk of flight or danger

7   to the community. *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007). One

8   important difference between these types of parole is that conditional release does not provide a

9   pathway for the immigrant to seek adjustment of status under 8 U.S.C. § 1255(a). *Id.* at 1119-

10  1120.

11        **C.    Parole Revocation**

12        In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at \*10-12 (D. Or. July 9, 2025)—issued several

13  weeks before Ms. Arostegui Castellon's arrest on July 30, 2025—the court explained the parole

14  process in immigration cases and noted that before parole may be revoked, the parolee must be

15  given written notice of the impending revocation, which must include a cogent description of the

16  reasons therefore. The court held:

17        Section 1182 . . . has a subsection titled "Temporary admission of
          nonimmigrants," which allows noncitizens, even those in required
18        detention, to be "paroled" into the United States. This provision, at
          issue in this case, states:

19

20        The Secretary of Homeland Security may, except as
          provided in subparagraph (B) or in section 1184(f) of this
          title, in his discretion parole into the United States
21        temporarily under such conditions as he may prescribe only
          on a case-by-case basis for urgent humanitarian reasons or
22        significant public benefit any alien applying for admission
          to the United States, but such parole of such alien shall not
23        be regarded as an admission of the alien and **when the
          purposes of such parole shall, in the opinion of the
24        Secretary of Homeland Security, have been served the
          alien shall forthwith return or be returned to the
25        custody from which he was paroled and thereafter his
          case shall continue to be dealt with in the same manner
26        as that of any other applicant for admission to the
          United States.**

27
          8 U.S.C. § 1182(d)(5)(A)
28

8

1    *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under

2    the Administrative Procedure Act, immigration parolees are entitled to determinations related to

3    their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An

4    agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the

5    agency fails to "articulate[] a satisfactory explanation for its action including a rational

6    connection between the facts found and the choice made." *Id*. Parole revocations in the context of

7    the INA, must occur on a case-by-case basis and may occur "when the purposes of such parole

8    shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall

9    forthwith return or be returned to the custody from which he was paroled." *Id*. at *12, quoting

10   § 212.5(e). Section 212.5(e) requires written notice of the termination of parole except where the

11   immigrant has departed or when the specified period of parole has expired.

12           In considering *Y-Z-H-L* and § 212.5(e), other courts have found that the statute requires a

13   case-by-case analysis as to the decision to revoke parole. In *Mata Velasquez v. Kurzdorfer*, No.

14   25-CV-493-LJV, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), the Court held similarly

15   but in the context of humanitarian parole:

16           This Court agrees that both common sense and the words of the
             statute require parole revocation to be analyzed on a case-by-case
17           basis and that a decision to revoke parole "must attend to the
             reasons an individual [noncitizen] received parole." *See id*. There is
18           no indication in the record that the government conducted any such
             analysis here. On the contrary, the letter Mata Velasquez received
19           merely stated summarily that DHS had "revoked [his] parole."
             Docket Item 62-1 at 5. Thus, there is no indication that—as
20           required by the statute and regulations—an official with authority
             made a determination specific to Mata Velasquez that either "the
21           purpose for which [his] parole was authorized" has been
             "accomplish[ed]" or that "neither humanitarian reasons nor public
22           benefit warrants [his] continued presence...in the United States."
             See 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata
23           Velasquez's parole violated his rights under the statute and
             regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.
24

25   In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3

26   (N.D. Cal. July 24, 2025), the Court reached a similar conclusion relying on the Due Process

27   Clause. In *Pinchi,* the court held,

28           . . . even when ICE has the initial discretion to detain or release a

noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody. See *Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

*Id.* Other courts, including this Court, have held similarly. *Doe v. Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme Court has consistently held that non-punitive detention violates the Constitution unless it is strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

## II.    ANALYSIS

### A.    Jurisdiction

#### 1.    Habeas Corpus

Under 28 U.S.C. § 2241, the Court the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

Ms. Arostegui Castellon seeks her immediate release from custody, which she contends violates the Constitution of the United States. (*See* Doc. 2.) Thus, she properly invokes the Court's habeas jurisdiction.

#### 2.    Judicial Review under the INA

The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

1   adjudicate cases, or execute removal orders against any alien," there is no removal order at issue

2   here. Even still, the government argues that the Court lacks the authority "to bar execution of a

3   future removal order." (Doc. 9 at 8-9) The Court does not disagree, but that is not the factual

4   setting of this case. Thus, Court has the authority to review the termination of Ms. Arostegui

5   Castellon's parole. *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g)

6   precludes judicial review only as to the three areas specifically outlined in the subsection); *see*

7   *also Reno v. American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999).

8        **B.  Preliminary Injunction**

9        The standard for issuing a TRO is the same as the standard for issuing a preliminary

10  injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir.

11  2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

12  "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

13  "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

14  the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

15  "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

16  (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

17  test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

18  1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

19  *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

20  Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

21  at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

22  the issuance of a preliminary injunction where there are "serious questions on the merits … so

23  long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

24  injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

25  never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

26  Preliminary injunctions are intended to "merely to preserve the relative positions of the parties

27  until a trial on the merits can be held, and to balance the equities at the litigation moves forward."

28  *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

11

1    The status quo refers to "the last uncontested status which preceded the pending

2    controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

3    *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

4    Court's view, that is the status before Ms. Arostegui Castellon was arrested and was still on

5    parole. *See Kuzmenko v. Phillips,* No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10,

6    2025) (granting a temporary restraining order requiring immediate release of the petitioner back

7    to home confinement from custody, as a restoration of the status quo).

8    Even if the Court's action here constitutes a mandatory injunction,[6] the evidence supports

9    that action. Ms. Arostegui Castellon's alleges she has suffered and is suffering violations of her

10    substantive and procedural due process rights and that her continued unlawful detention will

11    impose on her serious injury if the injunction does not issue. The injunction issued here is on firm

12    legal footing result does not appear to be doubtful either; due process clearly requires that

13    Petitioner be given a hearing before her bond is revoked. These injuries are not capable of redress

14    through monetary compensation. Accordingly, injunctive relief is appropriate even under the

15    higher standard for mandatory injunctions.[7]

16

---

17    [6] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination
      of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir.
18    2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until
      the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on
19    the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting
      *Meghrig v. KFC W., Inc*., 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction
20    is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages,"
      and the merits of the case are not "doubtful." *Id*. (internal citations and quotation marks omitted).

21    [7] The government questions whether the Court can order preliminary relief of the nature requested here because the
      relief sought is akin to the relief requested in the underlying § 2241 petition. (Doc. 9 at 3–4.) The government cites
22    *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992), which indeed held that entering "judgment on the
      merits in the guise of preliminary relief is a highly inappropriate result." But the circumstances of that case were
23    quite different. In *Mosbacher*, the trial court ordered as preliminary relief the release of data that the defendant sought
      to keep private and thus, had the Ninth Circuit not reversed, the defendant would "have lost the whole case for all
24    practical purposes." *Id*. Some district courts have relied on this line of cases to deny immigration detainee's requests
      for release at the TRO stage. *See, e.g., Mendez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-00829-TLT, 2023 WL
25    2604585, at *3 (N.D. Cal. Mar. 15, 2023) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Keo v.
      Warden of Mesa Verde Ice Processing Center*, No. 1:24-cv-00919-HBK, 2024 WL 3970514 (E.D. Cal. Aug. 28,
26    2024) (citing *Mendez*, *Mosbacher*, and *Comenisch*). But a closer look at *Camenisch* reveals that the Supreme Court
      did not intend to bar TROs of the kind requested here. Rather, *Camenisch* stands for the proposition that "findings of
27    fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not
      bind the court at the trial on the merits. Thus, it is not appropriate to enter a final judgment at a TRO stage." *Doe v.
28    Noem*, 778 F. Supp. 3d 1151, 1167 (W.D. Wash. 2025) (evaluating government argument based on *Comenisch*).

1            1.        Likelihood of Success on the Merits

2            This first factor "is the most important" under *Winter*, and "is especially important when a

3    plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

4    Cir. 2023). When an immigrant is placed into parole status after having been detained, a protected

5    liberty interest may arise. *Young v. Harper*, 520 U.S. 143, 147-149 (1997)[8]. The Due Process

6    Clause may protect this liberty interest even where a statute allows the immigrant's arrest and

7    detention and does not provide for procedural protections. *Id.* (Due Process requires pre-

8    deprivation hearing before revocation of preparole); *Morrissey v. Brewer*, 408 U.S. 471, 482

9    (1972).

10           *Morrissey* observed that parole allows the parolee to enjoy the same activities as those

11   who have not been arrested and held in custody including, living at home, having a job, and

12   "be[ing] with family and friends and to form the other enduring attachments of normal life."

13   *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many

14   restrictions not applicable to other citizens," such as monitoring and seeking authorization to

15   work and travel, "his condition is very different from that of confinement in a prison." *Id.* "The

16   parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live

17   up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on

18   the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected liberty interest in

19   his "continued liberty." *Id.* at 481–84.

20           In *Pinchi*, the Court held similarly:

21                    . . . even when ICE has the initial discretion to detain or release a
                      noncitizen pending removal proceedings, after that individual is
22                    released from custody she has a protected liberty interest in
                      remaining out of custody. See *Romero v. Kaiser*, No. 22-cv-02508,
23                    2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court
                      joins other courts of this district facing facts similar to the present
24                    case and finds Petitioner raised serious questions going to the
                      merits of his claim that due process requires a hearing before an IJ
25                    prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434,
                      2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v.
26                    Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal.

27   _____

8    In *J.G.G.*, the Supreme Court re-affirmed that aliens are entitled to due process of law in deportation proceedings
28   and must be given notice and an opportunity to be heard commensurate with the nature of the case. *Trump v. J. G. G.*,
     604 U.S. ___, 145 S. Ct. 1003, 1006 (2025).

1

2

> Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

3

4  *Pinchi*, 2025 WL 2084921, at *3.

5       The government attempts to skirt this line of cases by arguing that DHS may "at any time"

6  move Ms. Arostegui Castellon from Section 240 proceedings to expedited removal. (Doc. 9 at 8.) The

7  government argues:

8

9

10

11

12

13

14

15

16

17

> Petitioner falls within the designation that applies to aliens who have "not been admitted or paroled into the United States" and have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." [8 C.F.R. § 235.3(b)(1).] Specifically, Petitioner unlawfully entered the United States in January of 2022, and was determined inadmissible on January 20, 2022. Razalan Dec. ¶¶ 4 and 6. Petitioner has not shown that she has been physically present in the United States continuously for the 2-year prior immediately prior to January 20, 2022. Petitioner admittedly did not have the necessary documents to enter, pass through or remain in the United States. Razalan Dec. ¶ 5. Petitioner also falls under the 2004 designation, which applies to aliens who (i) "are physically present in the U.S. without having been admitted or paroled," (ii) "are encountered by an immigration officer within 100 air miles of any U.S. international land border," and (iii) cannot establish "that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter." 2004 Designation, 69 Fed. Reg. at 48,880.

18  (Doc. 9 at 8.) *Coalition* raises serious doubts as to the applicability of such arguments to Ms.

19  Arostegui Castellon factual situation, given that it "forbids the expedited removal of noncitizens

20  who have been, at any point in time, paroled into the United States." 2025 WL 2192986, at *22.

21       Though DHS could have placed Ms. Arostegui Castellon in expedited removal proceedings

22  when she arrived in the country, it did not. Rather, she was placed into § 240 proceedings and then

23  conditionally paroled for more than three years. The Court acknowledges that the statute indicates

24  that, "The Attorney General at any time may revoke a bond or parole authorized under subsection (a),

25  rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). As noted

26  above, this does not mean that DHS may act while ignoring constitutional requirements. The

27

28

14

1   government relies on *Contreras v. Oddo*, No. 3:25-CV-162, 2025 WL 2104428, at \*5 (W.D. Pa.

2   July 28, 2025), but *Contreras* does not assist here.[9]

3        Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424

4   U.S. 319, 334-335 (1976), to determine whether the procedures (or lack thereof) that have been

5   applied to Ms. Arostegui Castellon are sufficient to protect the liberty interest at issue. *Pinchi* at

6   \*3. In *Mathews*, the Court determined,

> [O]ur prior decisions indicate that identification of the specific
> dictates of due process generally requires consideration of three
> distinct factors: First, the private interest that will be affected by the
> official action; second, the risk of an erroneous deprivation of such
> interest through the procedures used, and the probable value, if any,
> of additional or substitute procedural safeguards; and finally, the
> Government's interest, including the function involved and the
> fiscal and administrative burdens that the additional or substitute
> procedural requirement would entail.

12   During her more than three years on parole, Ms. Arostegui Castellon obtained work, attended

13   classes at a community college, and built connections with her community. (Doc. 1, ¶ 2) Thus,

14   parole allowed her to build a life outside detention, albeit under the terms of her parole. Ms.

15   Arostegui Castellon has a substantial private interest in being out of custody, which would allow

16   her to continue in these life activities, including obtaining necessary medical care. As other courts

17   have done, the Court concludes that the government's interest in detaining Ms. Arostegui

18   Castellon or re-detaining her without a hearing, is slight. There is no dispute she has abided by all

19   conditions of her parole and, works, attends classes, has medical needs, and has no criminal

20   record. And the government concedes that has been no change in Ms. Arostegui Castellon's

21   circumstances that would warrant a finding that she is either a flight risk or a danger to the

22   community. At most, the government argues that the ongoing immigration proceedings supports a

23   finding of risk of flight. However, of course, the proceedings were ongoing at the time ICE

---

[9] The government cites *Contreras* to suggest that because Ms. Arostegui Castellon's detention is "required," she cannot succeed on the merits of her procedural due process claim. In *Contreras*, the district court concluded that the petitioner was in the expedited removal process, 8 U.S.C. § 1225(a)(1), and therefore was subject to mandatory detention. 2025 WL 2104428, at \*5. *Contreras* concluded re-detention was discretionary and that "[c]ompliance with the applicable INA statutes and DHS regulations satisfies procedural due process." *Id*. at \*5. The Court disagrees.

The government also cites (*see* Doc. 9 at 6), *Abdul-Samed v. Warden of Golden State Annex Det. Facility*, No. 1:25-CV-00098-SAB-HC, 2025 WL 2099343, at \*3 (E.D. Cal. July 25, 2025). In that case, the immigrant was subject to a removal order, unlike here, and <u>had never been released on parole</u>.

1    released her on her own recognizance. Thus, the Court concludes that she has demonstrated a

2    likelihood of success on the merits on her procedural due process claim.[10]

3          2.    Irreparable Harm

4          "It is well established that the deprivation of constitutional rights 'unquestionably

5    constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting

6    *Elrod v. Burns*, 427 U.S. 247, 272 (1976)). Moreover, "[t]he Ninth Circuit has recognized

7    'irreparable harms imposed on anyone subject to immigration detention' including 'the economic

8    burdens imposed on detainees and their families as a result of detention.'" *Hernandez v. Sessions*,

9    872 F.3d 976, 995 (9th Cir. 2017)); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011)

10   [the inability to pursue a petition for review may constitute irreparable harm]. The evidence

11   demonstrates that Ms. Arostegui Castellon is suffering significant physical and emotional distress

12   from her custodial status.

13         3.    Balance of the Harms/Public Interest

14         Because the interest of the government is the interest of the public, the final two factors

15   merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The

16   Court agrees with the analysis of *Pinchi,* and finds it correctly addresses the situation here:

17
            "[T]he public has a strong interest in upholding procedural
18          protections against unlawful detention, and the Ninth Circuit has
            recognized that the costs to the public of immigration detention are
19          staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up)
            (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting
20          *Hernandez*, 872 F.3d at 996); see also *Preminger v. Principi*, 422
            F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns
21          are implicated when a constitutional right has been violated,
            because all citizens have a stake in upholding the Constitution.").
22          Without the requested injunctive relief, Petitioner-Plaintiff faces the
            danger of significant health consequences and deprivation of her
23          liberty. Yet the comparative harm potentially imposed on
            Respondents-Defendants is minimal—a mere short delay in
24          detaining Petitioner-Plaintiff, should the government ultimately
            show that detention is intended and warranted. Moreover, a party
25          "cannot reasonably assert that it is harmed in any legally cognizable
            sense by being enjoined from constitutional violations." *Zepeda v.
            U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).
26
            This Court therefore joins a series of other district courts that have
27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [10] For this reason, the Court need not address the government's arguments regarding the Administrative Procedure
     Act.

16

1
2
3
4
5
6
7
8

> recently granted temporary restraining orders barring the government from detaining noncitizens who have been on longstanding release in their immigration proceedings, without first holding a pre-deprivation hearing before a neutral decisionmaker. *See, e.g., Diaz v. Kaiser*, No. 25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Garcia v. Bondi*, No. 25-cv-05070, 2025 WL 1676855, at *3 (N.D. Cal. June 14, 2025). Although Petitioner filed her motion shortly after being detained, rather than immediately beforehand, the same reasoning applies to her situation. Her liberty interest is equally serious, the risk of erroneous deprivation is likewise high, and the government's interest in continuing to detain her without the required hearing is low. *See Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025) (granting a TRO as to an individual who had been detained over a month earlier).

9   *Pinchi*, at *3. In addition, as noted, should a bond hearing now occur, the government admits it

10  has no evidence that there is a risk that Ms. Arostegui Castellon will flee or that she poses a

11  danger to the community. For these reasons and those set forth in *Pinchi*, the Court concludes that

12  the balance of the equities and public interest weigh in favor of Ms. Arostegui Castellon.

13          4.      Bond

14          "The court may issue a preliminary injunction or a temporary restraining order only if the

15  movant gives security in an amount that the court considers proper to pay the costs and damages

16  sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.

17  65(c). The court has "discretion as to the amount of security required, if any," and it "may

18  dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the

19  defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir.

20  2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed

21  in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753

22  F.2d at 727, the Court finds that no security is required here.

23          **C.  Parole Revocation hearing**

24          The government argues that if a parole revocation hearing is required, the Court should

25  not place the burden on the government to justify detention by clear and convincing evidence.

26  (Doc. 9 at 9). The government relies principally on *Rodriguez Diaz v. Garland*, 53 F.4th 1189

27  (9th Cir. 2022), in which the Ninth Circuit considered whether a noncitizen detained under §

28  1226(a) pending removal proceedings had a right to a second bond hearing where the government

1    would have the burden to establish by clear and convincing evidence that his continued detention

2    was justified. *Rodriguez Diaz* concluded that due process did not require that procedure,

3    reasoning in part that:

4           Nothing in this record suggests that placing the burden of proof on
            the government was constitutionally necessary to minimize the risk
5           of error, much less that such burden shifting would be
            constitutionally necessary in all, most, or many cases. There is no
6           reason to believe that, as a general proposition, the government will
            invariably have more evidence than the alien on most issues bearing
7           on alleged lack of future dangerousness or flight risk.

8    *Id*. at 1212.

9          However, as the *Pinchi* court explained, *Rodriguez Diaz* did not address the question

10   presented here:

11          The Ninth Circuit did not hold in *Rodriguez Diaz* that noncitizens
            facing removal under section 1226(a) have no due process right to a
12          pre-detention hearing. It held only that a noncitizen detained under
            section 1226(a) does not have a right to a second bond hearing
13          when the only changed material condition since their first bond
            hearing is the duration of their detention. Because the question
14          presented here was not presented in Rodriguez Diaz, the court had
            no opportunity to address it.

15

16   *Pinchi*, 2025 WL 2084921, at *4. *Pinchi* went on to discuss why the calculus changes for an

17   individual who had been paroled from immigration custody after their initial detention:

18          Even assuming arguendo that the post-detention bond hearing
            provided under section 1226(a) provides constitutionally sufficient
19          process for those noncitizens who have never previously been
            detained and released by DHS, [Petitioner's] circumstance is
20          different. Her release from ICE custody after her initial
            apprehension reflected a determination by the government that she
21          was neither a flight risk nor a danger to the community, and [she]
            has a strong interest in remaining at liberty unless she no longer
22          meets those criteria. The regulations authorizing ICE to release a
            noncitizen from custody require that the noncitizen "demonstrate to
23          the satisfaction of the officer that such release would not pose a
            danger to property or persons" and that the noncitizen is "likely to
24          appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
            "Release [therefore] reflects a determination by the government that
25          the noncitizen is not a danger to the community or a flight risk."
            *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017),
26          aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir.
            2018). [Petitioner] was apprehended by ICE officers when she
27          crossed the border into the United States [  ]. ICE then released her
            on her own recognizance. As ICE was not authorized to release
28          [her] if she was a danger to the community or a flight risk, the

> Court must infer from [her] release that ICE determined she was neither. [her] release from ICE custody constituted an "implied promise" that her liberty would not be revoked unless she "failed to live up to the conditions of her release." *Morrissey*, 408 U.S. at 482. The regulatory framework makes clear that those conditions were that she remain neither a danger to the community nor a flight risk. [She] justifiably relied on the government's implied promise in obtaining employment, taking on financial responsibility for her family members, and developing community relationships. The more than two years that she has spent out of custody since ICE initially released her have only heightened her liberty interest in remaining out of detention. Accordingly, [her] private interest in retaining her liberty is significant.

*Pinchi*, 2025 WL 2084921, at *4

This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-detention is necessary to prevent danger to the community or flight. *Id*. at *7. Doing so is logical under the circumstances for the reasons articulated in *Pinchi* – namely that the immigrant's initial release reflected a determination by the government that the noncitizen is not a danger to the community or a flight risk. Since it is the government that initiated re-detention, it follows that the government should be required to bear the burden of providing a justification for the re-detention.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court **ORDERS:**

1.      Petitioner's Motion for Temporary Restraining Order (Doc. 2) is converted to a Motion for Preliminary Injunction, and it is **GRANTED**.

2.      Ms. Arostegui Castellon **SHALL** be released immediately from Respondents' custody. DHS **SHALL NOT** impose any additional restrictions on her, such as electronic monitoring, unless that is determined to be necessary at a future pre-deprivation/custody hearing.

3.      Respondents are **PERMANENTLY ENJOINED AND RESTRAINED** from re-arresting or re-detaining Ms. Arostegui Castellon absent compliance with constitutional protections, which include at a minimum, pre-deprivation notice—describing the change of circumstances necessitating her arrest—and detention, and a timely hearing. At any such hearing,

the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Ms. Arostegui Castellon poses a danger to the community or a risk of flight, and Ms. Arostegui Castellon **SHALL** be allowed to have her counsel present.

       4.     The petitioner may file a brief on the merits within 60 days. The government may file an additional brief related to the merits of the petition within 60 days thereafter and the petitioner may file a reply brief within 15 days of the government's brief.

IT IS SO ORDERED.

Dated:   **August 14, 2025**

UNITED STATES DISTRICT JUDGE